May it please the Court. Your Honors, I represent Deputy Sheriffs Brian Carlisle and James Sheehan of the Brunswick County Sheriff's Office. Your Honors, in this case we simply ask you to apply long-standing law, a long line of precedent involving police shooting cases and offer Deputies Carlisle and Sheehan qualified immunity in this case on the federal claims against them for the split-second decision they made to employ deadly force on a dark night in Brunswick County in May 2007. Now, Your Honors, on the state law claims, we ask you to apply public officer's immunity for them, and as to the federal claims, the issue is whether qualified immunity applies to these officers, that is, whether a reasonable officer, objectively reasonable in that situation, could have done something that he thought was lawful at that time in using force. And you must filter the facts of this case, Your Honors, through the perceptions of the officers at the scene at the moment they employed force that night. And Your Honors, on the state law claims, the issue is simple. Whether the officers acted maliciously, corruptly, or outside or beyond the scope of their duties. Before you get to that, this comes to us in the posture of an interlocutory appeal. Yes, Your Honor. And Your Honor, when a defendant such as a law enforcement officer makes an appeal based on qualified immunity or public officer's immunity, that is right, that is properly before the court, rightly before the court? I understand that as a general matter, but the question here, of course, as it is with any interlocutory appeal, is whether we possess jurisdiction. And the Supreme Court's decision in Johnson v. Jones, if something is a purely factual dispute, we would not possess jurisdiction. We'd have to dismiss for want of jurisdiction. If there is a clean question of law, then we would have jurisdiction. And the question I have for you is, what makes this something other than a factual dispute over who did what when? Certain factual questions are not entirely clear to me. And if it's just a factual dispute, we wouldn't have, we wouldn't possess jurisdiction. I would just go to the jury the way it normally does when summary judgment is denied. If there's a pure question of law, we've decided, but I'd like you to isolate for me what the question of law is. I can isolate, I can tell you what some disputed issues of fact are. I want you to tell me what the clean issue of law is, because you've got to answer that in order for us to have jurisdiction. Yes, Your Honor, you are correct. And as you wrote in the Elliott case in 1996, all cases such as this involve some material disputes or factual disputes. But here, it's a simple question of law, because we accept the facts as the district court found them in the light most favorable to the plaintiff. The only question is, applying the reasonable standard, the objective reasonableness of the qualified immunity standard to the officers, did they violate a constitutional right of the plaintiff under the statute? Because that would be the case in every piece of litigation. That would give us automatic jurisdiction. That's not what Jones said. So, you're going to have to bring it down to a more specific question of law. What is the specific question of law before this court that gives us jurisdiction? Your Honor, the specific question is under the facts as the district court found them, which include... Well, the district court didn't find them. The district court had to take them. You have to take them in the light most favorable to the plaintiff, right? Yes, sir. And we do. And the question is... He gets all the facts. He gets all the undisputed facts. The undisputed facts are the undisputed facts. He gets all the facts that are... There are some disputed facts. But when there are disputes, he gets the benefit of it. Yes, Your Honor. For purposes of this. Yes, Your Honor. And the question is under the facts that the plaintiff gets, did the officers act objectively Was he armed or unarmed? He was armed, Your Honor. Well, but is that disputed? That is not disputed, Your Honor. That's not disputed? That's correct, Your Honor. He came out with a shotgun. But it is disputed as to whether the shotgun was pointed down or not. It is disputed for factual purposes that the shotgun was pointed down. But our argument is that... That's pretty important, isn't it? Well, Your Honor, the question is in this case, even if Mr. Cooper came out with a shotgun pointed down, were the officers objectively in fear of imminent harm or safety to themselves? Did he fire the shotgun? Well, there is a factual dispute about that. No, but so the factual dispute goes to him. We are not... Which is, what's the answer to it? What are these facts? The facts we take. For the purposes of this hearing, he did not fire the shotgun. He did not fire. Yes, Your Honor, that is correct. But there was pointing down. For purposes of this appeal, wouldn't the shotgun, wouldn't we have to accept the view that the shotgun was not pointed at the officers, that it was pointed down? Yes, Your Honor, you do. And they didn't announce themselves as police officers? They showed up in uniforms and patrol cars and they saw a man on the porch who recognized them as being law enforcement officers. They were clearly deputy sheriffs. Didn't have their lights on in front of their car? No, sir, they did not. And that goes to an important issue in this case. And when they showed up, they thought it was a somewhat routine disturbance call. On the night of May 2, 2007, they got a 911 call about two men arguing. And they heard the argument. Or they heard the argument as they approached the house. Yes, sir, they did. Didn't that make it a little less than routine at that point? It is somewhat a little more than routine for officers to show up at an argument. But there were no reports of shots fired that the officers were aware of. So when they showed up, they were not in a position where they were going to use force in their minds. But when Mr. Cooper came out of that door... Well, before that, they banged on the window. Isn't that correct? Yes, sir. And they didn't announce themselves? Well, they were in uniform, Your Honor. But they didn't announce themselves. They just banged on the window. What happened in that particular circumstance, Your Honor? It happened over a very short period of time, maybe a minute. The officers pulled up in their patrol cars. As they did, they saw a man on the porch. Was it dark? Yes, it was very dark, Your Honor. Were there blue lights on? No, sir, they were not. Why not? Because it was a routine disturbance call. And then they heard the yelling and they pulled their cars in. They saw a man on the porch. Did he even know they were police? Did the occupant of the trailer even know that these were police? Well, there were three occupants of the trailer that night, Your Honor. One of them was Mr. Cooper. And the other one was his cousin. And they had been out in the yard that evening smoking marijuana and using cocaine and drinking alcohol and partying. That doesn't have anything to do with whether they knew they were police coming up. The question is of facts. If you look at them in the light most favorable for the plaintiff, did they know these were, is there evidence to show they knew these were police officers? Your Honor, the undisputed fact is that there was a man on the porch who saw the officers. And the court, the case is saying... Isn't it, isn't it, isn't the fact taken in the light most favorable for the plaintiff, the one we have to take, that he didn't know they were police officers? When he stepped outside with the shotgun pointed down. Mr. Cooper did not, Your Honor. That is correct. Cooper did not. Yes, but there were two other people in that house that night. Mr. Cooper is the one that was shot. Yes, sir. How many times was he shot? He was shot about five or six times, Your Honor. Did they tell him, normally you have a warning, and did they give him a warning to drop the gun or to do something like that because in these very tense confrontations, normally a warning is given. You know, raise your hands. Get your hands out of your pocket. Drop the firearm. Drop the gun. Well, Your Honor, in one case... No, no, no, no, no, no. Here, did they give a warning? No, sir, but in the McLenican... Is a warning required? No, sir, it's not. In the McLenican v. Carnes case... Is it advisable? It is advisable if there's time. Why didn't they give him one? Well, because they were, as the court said, this court said in the McLenican case, the officer simply didn't have time. The man was... Well, they could have given a warning when they knocked on the window. Well, that was a warning in a way, Your Honor. Well, but that wasn't a warning from a police officer or authorities. It had been an intruder. Let's step back for a minute and remember that the overlying case law here is that you have to look on the Qualified Immunity Analysis at the reasonable perceptions of the defendant. Let's make sure we put it in context. This was his residence, wasn't it? Yes, sir, it was. He's at his residence, and it's dark. It is very dark. And someone comes up, and in the light most favorable, he doesn't know who it is, knocks on the window. But he has a gun. Anything wrong with having a gun in a house in North Carolina? No, sir. Anything wrong with coming to the door with a gun in your hand? Well, you have to look... Tell me, anything wrong, is there anything illegal, anything even of your own home, standing out in front of it with a gun, anything remotely illegal about that? It depends on the situation, Your Honor. Tell me what makes it illegal here, then, if it depends on these situations. Well, you have to look at, and remember, you have to look on the Qualified Immunity Analysis. If we can accept they do not know these are officers. You have to look at the perception of the officers at the time that they employed force. But the officers know they are coming to a residence. They know that it's out in the middle of a place where it's screaming. Yes, sir. They know this man is in his own house. Yes, sir. And they also know the laws of North Carolina. They know the Second Amendment rights. They know that there are a lot of folks with guns out here. Yes, sir. And why in the world would you not say, we are police officers? Because they pulled up and they saw a man look at them when they were in uniform getting out of patrol cars. So in their minds, they already have identified themselves. And when that man walked in the house, and then another man came out with a gun, they made the instantaneous split-second decision that they had to use force to defend themselves. So it was instantaneous? He walked into the house? The officers did not walk into the house. Why couldn't they at that point, once they saw him go to the house, turn the lights on and announce, we are police officers? They had already gotten out of the patrol car, Your Honor. How many different officers fired at Mr. Cooper? Two officers. Deputies Carlisle and Sheehan, Your Honor. Did they fire simultaneously? Yes, sir. They did. How many shots did they fire? They fired probably about seven or eight Yes, sir. So they came to the conclusion simultaneously that they were in danger? Yes. Well, Your Honor, for the purposes of this appeal, the issue is when the officers came to the front door as they were walking up, when the man came out with a shotgun after the officers had just seen a man go in the house, yes, they were immediately in fear of their lives. One of the things, counsel, is we've had such a fact intensive discussion here. Doesn't that suggest it might be a good thing to bring before a jury which really has a particular capacity for fact finding? Because I still haven't gotten a satisfactory answer to the question I posed to you earlier and that is what clean question of law is presented for us to even have jurisdiction to decide this rather than to dismiss the appeal and let it proceed before a jury. Well, Your Honor, in the McLennigan v. Carnes case, this court in 1994... No, no, no. Question presented, okay? Pose the question of law. Don't back around to cases and everything. Just  two deputy sheriffs pull up in uniform out of a patrol car and think that a man has already recognized them as law enforcement officers and the man's unarmed and goes into a house and then comes out... You're making a lot of factual assumptions there. These are undisputed facts, Your Honor. That they thought it? That we have to just thinking it alone? You don't have to have facts to support those thoughts? Well, Your Honor, the fact is that it's undisputed that there was a man on the porch. Both deputies... There's no fact that shows that he knew they were police officers. Well, there's no fact that Mr. Cooper... You just said there was. They knew they were police officers. No, Your Honor. There was a man on the porch. Mr. Cooper says it wasn't him and so you have to accept that fact. So the clean question of law is filtering, as you must do, the perceptions through the officer's viewpoint at the time they used force. In the overwhelming case law, that's what you do. Did the officers feel they were reasonably in fear of imminent death or serious injury? And when they pulled up to the porch without their guns drawn, when they were walking up to the porch, they had not decided at that point that they were in danger until the man came out with a shotgun. Does it matter if they create fear? If the situation is created, the fear that they then have is something they've created. They show up assuming they did see him and a man walks back in the house. From that you say fear arises. And anybody that walks out on the front of a door with a gun, they can blow him away. Is that it? Is that the case we got? Well, no sir, it's not. And as Judge Wilkinson said in the Elliott v. Levitt case, no citizen can fairly expect to draw a gun on police without risking tragic circumstances. He didn't draw a gun, as I understood it. Fact showed he just walked out with it. With a shotgun pointed down. Yes, sir. That's not drawing a gun on the police. On his own porch. It's a small porch. It's really not a house. It's a trailer, right? Yes, sir. Yes, Your Honor. He comes out of the trailer with the shotgun after they've knocked on the window in the dark without announcing police officers. Police officers, didn't say a word, just knocked on the window. He comes out with the shotgun pointed down and they shoot him six times. Yes, Your Honor, but what the deputies... On his own porch. Yes, but what the deputies did at that point... The question, is there a factual dispute? There is no factual dispute because the question... You say there's no factual dispute, but you've got to twist the facts around to support you. And Your Honor, I see I'm out of time. May I finish and answer your question? Yeah, sure. You've got some rebuttal time. You go ahead and finish. Yes, sir. The clean question of law is taking the facts in the most favorable light to the plaintiff. When he came out, after the officers had just seen a man go into the house, did the officers then reasonably think that a man was hostile to police when they were in uniform and having shown up in patrol cars? And Your Honors, for these reasons, we ask you to... That's got to assume they knew these were police officers. And the evidence in the light most favorable to the other side, they argue, is that he didn't know they were police officers. Yes, sir, but you must filter the facts through the perceptions of the officers at the time. That's what the Qualified Immunity Analysis is. It has to be a reasonable perception. I mean, let me just follow up. Judge Wynn indicated that the danger that was created was created by the officers' actions themselves. Wouldn't the fact that all of this is taking place in the middle of the night at 1130 p.m., where there's a lot of confusion likely to reign, where, as Judge Wynn points out, a lot of people are likely to have mistaken officers or anybody for an intruder. I mean, as far as I know, this man didn't even want to gun down police officers. He wanted to protect his trailer against somebody who might have come in and tried to rob him. Your Honor, he testified that he did not think anyone was breaking into his house. Well, but somebody could have been up to no good. Somebody could have been trespassing on the property. That's not what he thought. He testified that he thought one of his family... They weren't essentially trespassing on the property. They're over knocking on the window and not saying who they are. No, and actually, Your Honor, the district court found that the officers reasonably identified themselves or, I'm sorry, reasonably were on the property, lawfully on the property and reasonably made efforts to identify themselves. Well, they may have been reasonably on the property, but the question was whether they communicated that to him because if you're out there in the country and it's late at night and people have been drinking and all the rest, the officers would expect that somebody would want to... It may be a question of just self-defense and protecting themselves and protecting their property, in which case the officers should be aware of the fact that a lot of people who live in property late at night get very apprehensive when they see other people roaming around the yard. If I were in my home late at night and I heard somebody tapping on the window and I knew that they were roaming around in the yard, I'd be pretty upset, too. And wouldn't it be important for the officers to kind of settle the situation down a little bit and reassure the homeowner that they weren't out to rob him or do something? Wasn't it up to them to settle down a situation that was rife with the potential for confusion and actions taken possibly in self-defense? I mean, they had a certain obligation there, didn't they? Yes, sir. And that's why they tried to identify themselves. When they pulled up and they saw a man walk away from them, the first thing they did when they got out of the patrol car was they saw a big bay window with lights on and they tapped on the window to let the guy know, hey, you just walked away from us. We're here. So when they didn't get anything... They didn't say anything. You've heard of the knock-and-announce rule. Yes, sir. I mean, they trained officers on the knock-and-announce rule. If you're executing a search warrant, if you're out there with a search warrant, if a judicial officer told them to go there and search this place, they would abide by the knock-and-announce rule. But in their minds, they had identified themselves and that's... They didn't have any paperwork going out there. They had uniforms, badges, and blue lights on their cars, Your Honor, and they had sheriff markings on at least one of the cars. I don't think it was disputed whether the blue light was on. Well, the blue lights were not on, Your Honor. The blue lights were not on. They were not on, but they were on the car. And one of the cars had... Blue lights are on the car on the dark night. Right under a utility pole, Your Honor. You agree it's 1130 at night. It's very dark. It is, Your Honor. Dark night. But the police car pulled under a utility pole that was 40 feet away. So, when the officers pulled up, in their minds, they had already identified themselves. And when they knocked on the window, they heard cursing and stopping off. The yelling of a sentence. People could curse at their own house? Yes, sir. But all these things... Without having the police come and shoot them off the porch? Yes, sir. But all these things, the totality of the circumstances created in the officer's mind a reasonable belief when the man came out that they were under a threat from someone hostile to police. All right. Thank you, sir. You have some time for rebuttal. Thank you, Your Honors. Ms. Conner, let's hear your side of it. Good morning, Your Honors. May it please the Court, my name is Laura Conner. I'm here representing Mr. George Cooper, Sr., the plaintiff in this matter. Your Honors, very simply, we would ask you simply to affirm the decision of Judge Dever in this matter so far. Would we affirm, or if we thought there was simply too many factual uncertainties, wouldn't we dismiss on the Johnson v. Jones for warrant of jurisdiction? Certainly, Your Honor. I think it's very clear... You'd take that? You'd be happy with that? I certainly would, Your Honor. Take it and run. Under the circumstances this clearly, there are a number of factual disputes in this situation. Judge Dever... and counsel said, no, we're bending over backwards not only to give you the benefit of inferences, but we're going to take the facts just that you allege as being locked in truth. Well, Your Honor... So, what do you think are the factual disputes here and why? Your Honor, in this situation, I think that Judge Dever did a very good job of listing out what the two sides of this story are, and I think that under the circumstances, the plaintiff's facts are these. First of all, just overwhelmingly as a general matter, under the plaintiff's facts and the light most favorable to the plaintiff, there was no notice and no warning of any kind of police presence when Mr. Cooper stepped down on his porch that evening. He said they knocked on the window. They did knock on the window. I believe that the quote that I saw about that that I believe is very appropriate is that in this situation, banging on a window is not an unambiguous sign of police presence. This is not a bang on the window with sheriff's office open up. This is just a bang on the window at 1130 at night in a rural area in the dark. Would an intruder be likely to knock on a window? Well, Your Honor, I think under the circumstances... If I was going to rob somebody or whatever, I wouldn't knock on a window and say, hey, I'm here. Yes, Your Honor, and I think it's very confusing to the homeowner. I mean, it's not something that normally happens in the course of a normal evening. I think what it comes down to... You're saying that the confusion heightened the officer's sense of danger. Your Honor, in this particular situation, I would... Well, let me back up a little bit, Your Honor. We're talking about facts here, and in this situation, I think that everything has sort of zeroed down to a couple of facts that I'm not sure were in dispute quite so hotly a little bit earlier in this matter. Just tell me what the disputed facts are from your perspective. Well, from our perspective, Your Honor, the plaintiff's facts are these, and I'll outline where the defendant disagrees with them. So the plaintiff's facts, as per his testimony, is that he, his cousin Paul Herring, who was another adult, were in his home at that time in the trailer. Mr. Cooper's testimony is that he was preparing to cook dinner, that Mr. Herring was watching television in the living room, and then Mr. Cooper's son, George Jr., who was approximately eight years old at the time, is in his bedroom watching television. So the plaintiff's evidence is that everyone is in the house at the time that this banging occurs, and had been for approximately 15 minutes. Now, the defendant's testimony at this point is that there was a black man or a figure on the porch. So that's certainly a disputed fact under these circumstances, and I think that Judge Devere notes that more than once in his decision. I think everybody agrees that it was 1130 at night, rural area, very dark evening. The plaintiff's fact is this, he was not aware that anyone was outside until he hears this banging on his window. He calls out to ask who it is, receives no response, appears outside, it's very dark, he doesn't see anyone. He picks up his shotgun, by the butt, barrel pointed down, opens the door, takes two or three steps out on the porch, again calls who is it, stands there for two or three seconds, and then is shot multiple times. And the plaintiff's evidence is that he never knew who shot him until it had already occurred. So really, at this point, Your Honors, the man on the porch is a disputed fact, and I will point out, Your Honors, that the officers in this situation, when asked why they fired, when asked why they made the decision to use deadly force, there was no answer. He was on the porch when we pulled up, and then he went inside, and that sort of gave us an impression that maybe he was hostile to the police. But your view is that the officers didn't announce themselves. They certainly didn't. Or identify themselves either when they tapped or when he stepped out on the porch or by virtue of turning on their blue lights. There were three opportunities that were present for the officers to announce and no one of those three junctures did that. Yes, precisely, Your Honor. There's no announcement, and the plaintiff's facts were that the plaintiff had no idea who was outside until after he was shot. In the case of Elliot V. Levitt, the person who had drawn the gun, and also the officers were not trespassing they're not trespassing, clearly, but they weren't on his property. This is, you know, when you get somebody on your property. Late at night. Your natural instincts are to protect your family and to protect your property. If you've got an 8-year-old child watching television they might not just want people coming in and doing whatever they plan to do in front of that 8-year-old kid. Yes, Your Honor. So, you want to protect your family. Yes, Your Honor. It's not just your property. You've got people you love in there. Yes, Your Honor. So, under the circumstances, I would very strongly state that this is, in fact, a factual dispute at this point. Let me ask you this. Yes, Your Honor. It goes back, tried, this tapping on the window. Yes, Your Honor. The other side says, that means they were identifying themselves. You said no, it's confusing. And it seems to me, the fact of tapping on the window is undisputed. Yes, Your Honor. But the inference that can be drawn from it or the conclusion that can be, that arises from it. Yes, Your Honor. Is not. Yes, Your Honor. And is that something the jury then, would the jury be able to conclude otherwise? That, yeah, by tapping on the window they identified themselves as Judge Wilkerson said, you know, a thief doesn't come in and tap on the window. But that could be one of those inferences that a jury potentially used. Your Honor, I think that the reasonable inference when someone taps on the window is that someone's tapping on the window. I'm not sure that a jury necessarily will conclude that someone's tapping on your window at 1130 at night. Ergo, it's the Sheriff's Department of Brunswick County. I don't think that that was an unambiguous signal of any kind of police presence. It's simply an unambiguous signal of someone's presence. So we look at the perception of the officers and determination of reasonableness and it seems as though the argument here really is that whatever perceptions they were having, it was really speculative. Yes, Your Honor. And really not in the realm of being classified as being reasonable. Yes, Your Honor. Of course, to get there, it's not a probable, it's not a preponderance type standard. It doesn't have to be true. Yes, Your Honor. It just has to be reasonable. Yes, Your Honor. And I think that what it comes down to is the summary judgment standard is that one takes the facts of the plaintiff in the light most favorable to the plaintiff with all reasonable inferences to be drawn there from. And if we take the facts of the plaintiff in this situation, this was not a reasonable decision on the part of these officers. I haven't seen very many cases so rife with the different factual suppositions and so rife with the potential for confusion. Yes, Your Honor. Recollections aren't always crystal clear even in broad daylight. But when you're talking about 1130 at night in a remote corner of a very remote rural area, who did what whom on the cover of darkness, who thought what, who reasonably thought what, this is about as confusing and factually disputed tableau that I've seen in a long time. I'm not sure I feel comfortable trying to sort it all out. Yes, Your Honor. Unless I heard the actual people involved. You know, there's an advantage, I don't mean to discredit lawyers in any way, but it's one thing to hear lawyers talk and it's just another thing to hear the occupants of the trailer and the police officers and the actual witnesses. Yes, Your Honor. That's a, that's a, sometimes shed a different sort of light than an appellate argument. The police officers have a tough job, you recognize that? Absolutely, Your Honor. In the middle of the night in the rural areas. Absolutely. I mean, you gotta be careful if someone steps on the porch. Absolutely, Your Honor. With a gun. And we certainly. With a firearm. If you win at this stage, it doesn't mean you necessarily win anything. Yes, Your Honor. All you're going to be getting is going back for a trial. Yes, Your Honor. And the jury might say the police officers acted reasonably. They certainly. Recognize that? I do, Your Honor, and I think under the circumstances that really is what this all boils down to and I think this is what Judge Devers said it boils down to. You're going to say a trial and under these circumstances we had every right to be edgy, we had every right to be apprehensive, we were dealing with folks late at night that had been, people had been drinking. They're not always in control of themselves when they're drinking. Cocaine was involved. The officers fired simultaneously which may well have led to a simultaneous perception that their lives were in danger. I mean, there's a case that can be made in opposition to yours, you know that. I certainly do, Your Honor, and I think what it boils down to is It's going to be a tough fight. Absolutely, Your Honor, and I think what it boils down to is it's a fight that needs to be heard and sorted out by a jury. You're hoping it comes mostly from Brunswick County. I'm sorry, Your Honor? No, I'm just kidding. Which county is this from? Brunswick County, Your Honor. Brunswick? Yes, Your Honor. Is that down close to Wilmington somewhere? Yes, Your Honor, below. South Wilmington. Holden Beach. Thank you. Thank you very much, Your Honors. Let us hear from you in rebuttal, please, Mr. Guice. Your Honors, what you just described as far as the factual disputes is the same thing that was present in the Anderson case, the Milstead case, and the McClannigan case. And the question is in those cases, or the question was in those cases, as it is in this case is, at the instant the officers decided to use force, did they, in their minds, have a reasonable perception that they were in danger? And if you take all these cases and you stop them frame by frame, you can say, well, the officers should have done that in this case. They should have waited. They should have taken cover. All this is second guessing. And the courts, the overwhelming authority of the court's opinions in this circuit are that the officers don't have to do that. That's what qualified immunity is all about. What they do is they say, we look at the reasonable perceptions of the officers. An officer pulls up in the middle of the night and sees a man on a porch. A man goes in. The officers try to identify themselves. And then as they're walking up to try to knock on the door to let the inhabitants know they're there, a man comes out with a shotgun. In that instant, did the officers objectively fear that they were in harm? And the answer is clearly yes, even given all the facts the plaintiff has laid out. And that's why they are entitled to qualified immunity. You know, Your Honors, there's one case from outside the circuit. Would they have been objectively reasonable in feeling that they were in danger of harm if a person was simply standing on his front porch with a shotgun pointed down? I mean, the positioning of that shotgun matters greatly, does it not? It does if you don't have the man on the porch, Your Honor. Yes, if they pull up and they just see a man standing there with a shotgun pointed down, hey, someone's exercising his Second Amendment rights. What I asked earlier about that, when you take that set of facts, the way you posit it, a police officer just walking up to a house, if a man walks into the house, just walks in, and then another one walks out on the front porch with a gun, you can blow them away. No, Your Honor, but what the officers were there for was a 9-1-1 call. I understand that, but the light most favorable is what I'm dealing with here, and that is the evidence here. Whether they are there for a 9-1-1 or just happen to be walking by, and they happen to see a man walk out with a gun. Now, you have a rather distinguished military career. You understand that guns are sort of present, and you know the climate of what we're in. I mean, this is not something that's not going to happen over and over again. I got to believe that. I mean, increasingly, if the presence of guns, particularly for residences, are there, and I would think particularly in the rural area, there are a lot of folks with guns, and to walk out with a shotgun is kind of common. When I grew up, my father always had one by the side of the bed. I promise you, if you drove up to the house or walked up, that gun was picked up, and that's sort of a natural reaction. You probably know this, and I know this is outside of the record, but you can't just get rid of common sense. You know where you are. They know where they are. They're out in Brunswick County. Is this a trailer? Yes, sir. They're in a trailer area. They got people out there drinking. One guy walks in. You know you're not walking in the Chapel Hill downtown somewhere, some nice little spot there. You know where you are, and you know that there are guns in that. You pretty much have a strong belief there are guns in there, so to walk out with a shotgun, which can be used for so many purposes. I mean, there's a shotgun. That's, I mean, you could have probably gotten that response from just about every trailer around if you'd walked up and knocked on a window. I mean, they could have walked in every trailer, just knocked on the window. Every time someone walks out, blow them away. You'll get no argument about the guns in the trailer and the right to bear arms in your own home and defend your own home? No argument that there's a prevalence of it that we almost can take judicial notice of. Yes, sir. Do you agree Mr. Cooper acted reasonably? No, sir. His blood alcohol level was .21. He was under the influence of cocaine and marijuana. I don't think he was reasonable. He can drink at home if he wants to, and he can cuss at home. I wouldn't give him... Well, I'm just following up on Judge Wynn's comments unless you disagree with him. If someone knocks on your window at 1130 and you're going to check on it, you go to the door in a rural area in the dark, you go with a weapon. And he did point it down taking the evidence to the light most likely to do that. Yes, sir. So, how can you disagree with the proposition that Mr. Cooper, in those circumstances giving him the benefit of the facts, acted reasonably? Because that's not the standard that you have... He got shot six times. Because that's not the standard that you have to look at on a qualified immunity analysis appeal, Your Honor. You have to look at the totality of the circumstances that existed in the officers' minds at the time they used force. And at the time, when you add all these facts together, I show up on a 911 call, I pull up under a light where people can see me getting out of a marked patrol car and I'm in uniform, my partner's in uniform. I've identified myself by knocking on the window and I hear cursing and stomping off. And then I walk up after a man has gone in the house and another man comes out with a gun. I'm under threat of serious harm from someone who's hostile to the police. Your Honors, I see I'm out of time. I thank you for your consideration. Is there no more questions? I think I may have cut you short. Do you really have anything you wish to add? No, Your Honor. Thank you, Your Honors. We'll come down in Greek Council and we'll move right into our next case.
judges: J. Harvie Wilkinson III, Robert B. King, James A. Wynn Jr.